**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **J.K.A. AND T.B.F.** | **CIVIL CASE NO. 25-962** |
| **VERSUS** | **JUDGE EDWARDS** |
| **UNITED STATES OF AMERICA, ET AL** | **MAG. JUDGE PEREZ-MONTES** |

**MEMORANDUM RULING AND ORDER**

Before the Court is a Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) (R. Doc. 88) filed by the United States of America, U.S. Department of Homeland Security ("DHS"), Kristi Noem, in her official capacity as Secretary of DHS, U.S. Immigration and Customs Enforcement ("ICE"), and Todd Lyons, in his official capacity as Acting Director of ICE (collectively, "Defendants"). J.K.A. and T.B.F. (collectively, "Plaintiffs") oppose (R. Doc. 92). Defendants replied (R. Doc. 93).

After careful consideration of the parties' memoranda and the applicable law, Defendants' Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND[1]

This case arises out of the alleged mistreatment suffered by Plaintiffs during their detention and deportations. Plaintiffs, J.K.A. and T.B.F., are Cameroonian nationals who came to the United States in August 2019 seeking asylum. *See* R. Doc. 29 at 7. After Plaintiffs requested asylum, they were placed in immigration detention

[1] The factual background below comes "from the operative [...] complaint because, at this stage, we accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff...." *Nevarez v. Dorris*, 135 F.4th 269, 271 n.1 (5th Cir. 2025) (citation modified).

in the custody of DHS and ICE for approximately 14 months, from August 2019 through October 2020 at the Pine Prairie ICE Processing Center in Pine Prairie, Louisiana ("Pine Prairie"). *See id*. at 8. ICE has a contract with Geo Group, Inc. ("Geo Group"), a private prison company, to operate Pine Prairie. *See id*. at 9.

In August 2020, Plaintiffs and approximately forty-five individuals renewed a hunger strike in protest of their indefinite detention; racist treatment and conditions of confinement; blanket parole denials, particularly of the applications of Black detained people; across-the-board failure of ICE to respond to *pro se* parole applications; false and misleading statements by ICE regarding the sincerity of the custody review process; and the inhumanity of being detained during the COVID-19 pandemic. *See id*. at 10. On August 10, approximately the eighth day of the renewed hunger strike, ICE officers entered the unit where Plaintiffs were being detained and stated that they would be removed to the "Echo" unit—which is comprised of solitary confinement cells. *See id*. Although Plaintiffs allege that they did not resist, Plaintiffs claim that approximately 15 officers entered the unit with pepper spray and handcuffs and physically attacked Plaintiffs. *See id*. at 10–11.

In solitary confinement, J.K.A. shared a cell with another Black migrant. *See id*. at 11. He alleges that although his skin was "on fire" and his "eyes were burning intensely," he was not permitted access to an eye wash or provided medical treatment. *See id*. The painful burning of his skin and eyes lasted for more than a week after the attack. *See id*. T.B.F. was housed in solitary confinement alone, but similar to J.K.A., he was not permitted access to an eye wash or provided medical treatment following

the attack. *See id*. T.B.F., who "suffers from severe asthma" and "requires consistent access to his inhaler, which he is required to use three times a day," allegedly was not permitted access to his inhaler or asthma medication for four days. *See id*. at 7, 10, 11. As a result, T.B.F. had an asthma attack. *See id*. at 11. All-in-all, Plaintiffs were in solitary confinement for seven days, during which they were in their cells for 24-hours a day and did not have access to any recreational or outdoor time. *See id*.

After being released from solitary confinement, Plaintiffs and others resumed their hunger strike. *See id*. at 13. However, on August 24, officers in riot gear entered their unit and told the group that if they continued their hunger strike, they would go back to solitary confinement. *See id*. J.K.A. was then pepper sprayed in the face and forcibly taken back to solitary confinement, and officers used force to push T.B.F. and handcuff him before taking him back to solitary confinement. *See id*. Plaintiffs allege that they were placed in cells that were not cleaned or sanitized even though other detained individuals who were exposed to or infected with COVID-19 were previously housed in the cells. *See id*.

Roughly three days after being placed in the allegedly contaminated cell, J.K.A. began to develop COVID-19 symptoms, including a severe cough and a fever, however, he was never tested or provided medical treatment during this time. *See id*. at 14. And after four days in his new cell, T.B.F. developed a fever, cough, chest pain, and had difficulty breathing. *See id*. He was tested for COVID-19 but never received the results. *See id*.

Following the August 2020 hunger strikes, Plaintiffs and the other hunger strikers notified ICE officials about their cases and conditions of confinement and made repeated requests to speak with them. *See id*. at 15. ICE officials allegedly met with individuals to "negotiate a review of their pending parole applications in exchange for an end to the mass hunger strike." *See id*. Plaintiffs and others agreed to a "temporary pause" of the hunger strikes after ICE officials said they would review the pending parole cases of the protestors. *See id*. However, ICE allegedly failed to review the pending parole applications and negotiations failed. *See id*.

Plaintiffs and other Black asylum seekers were transferred from Pine Prairie to LaSalle Detention Center in Jena, Louisiana, "in an effort to repress their hunger strike." *See id*. at 22. Plaintiffs were then told by an ICE officer that they were being transferred again because they were going to have an opportunity to have a second Credible Fear Interview, a statement that was allegedly "false and intended to mislead and deceive" Plaintiffs. *See id*. ICE officers allegedly threatened T.B.F. "and presented him a travel document with a forged signature." *See id*. Officials put Plaintiffs on a bus to Alexandria but did not tell them they were being deported. *See id*. When they arrived in Alexandria, they were told that they were being moved to Prairieland Detention Center in Alvarado, Texas ("Prairieland"). *See id*. J.K.A. understood he was being deported and when ICE officials approached him, he started crying before handcuffs and chains were placed around his hands, legs, and waist. *See id*.

While Plaintiffs were at Prairieland, they were allowed to make phone calls; however, after two days, their access to phones was cut off. *See id*. at 23. Plaintiffs had sensitive documents related to their asylum applications located in their bags, but when they asked an officer for access to their bags, their requests were denied. *See id*. After Plaintiffs "began to protest this denial," "the officers brought out a small number of bags." *See id*. But, J.K.A. was never allowed access to his bag. *See id*. Plaintiffs allege that ICE gave the facility guards instructions not to give them access to their bags. *See id*. at 24. Plaintiffs claim they feared they would be killed if sensitive documents in their bags were discovered by Cameroonian authorities. *See id*. at 23.

According to Plaintiffs, "ICE officials in Washington, D.C. planned and coordinated" their deportation flight on October 13, 2020, "including by arranging for photo and video documentation of the flight and coordinating flight logistics." *See id*. at 27. Further, Plaintiffs allege that ICE designated the flight a "Special High Risk Charter" flight, which, according to the ICE Air Handbook, was "to remove Failure to Comply [ ] and significant High-Profile Removals [ ] from the United States." *See id*. This designation allegedly placed a SWAT team of officers on the flights. *See id*. On October 13, 2020, "Plaintiffs were restrained and forced onto a plane even though they expressed fears about facing harm if they were returned to Cameroon." *See id*. at 28. During the roughly 16-hour flight, "Plaintiffs remained shackled in the five-point restraints they were placed in at the Fort Worth airport." *See id*. They were unable to move and could not eat the bread or drink the water they were provided on the flight, nor were they allowed to use the restroom. *See id*. During the flight, J.K.A.

experienced pain to his wrists and ankles from the chains and was allegedly left with cuts and bruises. *See id*. T.B.F. was also restrained, allegedly cut and bruised, and he did not have access to his inhaler or medical assistance. *See id*. at 28–29.

When they arrived in Douala, Cameroon, Plaintiffs witnessed Cameroonian authorities searching bags. *See id*. at 29. J.K.A. alleges that he witnessed ICE officials give Cameroonian authorities his identification and belongings before he was detained and interrogated by Cameroonian military police. *See id*. He was then transported to a house surrounded by military officials with guns and kept there for a week. *See id*. Everyone there, including J.K.A., were members of the Southern Cameroons National Council and were repeatedly called traitors. *See id*. J.K.A. escaped and has been in hiding since. *See id*. T.B.F. was held at the airport and detained for two to three hours before being taken to "quarantine" in Yassa, Cameroon and detained for the night. *See id*. at 30. His sister paid a bribe for his release. *See id*. Since escaping the Cameroonian military, T.B.F. "has lived in hiding in Cameroon and fears for his life and safety." *See id*. The Cameroonian government has since issued a warrant for his arrest. *See id*.

Plaintiffs submitted administrative claims to DHS, ICE, and the Department of Health and Human Services on August 9, 2022. *See* R. Docs. 88-2, 88-3. On February 7, 2023, DHS and ICE denied Plaintiffs' administrative claims. On August 7, 2023, Plaintiffs filed suit in the United States District Court for the District of Columbia. *See* R. Doc. 1. On January 31, 2024, Plaintiffs filed their First Amended Complaint. *See* R. Doc. 29. Defendants filed a Motion to Transfer, or In the

Alternative, Motion to Dismiss, arguing that the acts and omissions complained of in the lawsuit took place in the Western District of Louisiana. *See* R. Doc. 31. On June 23, 2025, the D.C. District Court granted the Motion to Transfer and denied the Motion to Dismiss without prejudice to its renewal in this Court. *See generally* R. Doc. 50.

Plaintiffs' Amended Complaint asserts claims of abuse of process, negligent supervision, negligence, battery, assault, and intentional infliction of emotional distress under the Federal Tort Claims Act, 28 U.S.C. § 1346 ("FTCA"). *See generally* R. Doc. 29. Plaintiffs also allege a claim against DHS and ICE for violating the Administrative Procedure Act ("APA") and the *Accardi* doctrine by failing to comply with their own regulations for maintaining the confidentially of asylum application materials, and for violating the APA by failing to abide by their own standards for use of force. *See generally id.*

## II. APPLICABLE STANDARDS

### a. Rule 12(b)(1)

Federal courts are courts of limited jurisdiction. *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005); *Peoples Nat'l Bank v. Off. of the Comptroller of the Currency of the U.S.*, 362 F.3d 333, 336 (5th Cir. 2004). Without jurisdiction conferred by statute or the Constitution, federal courts lack the power to adjudicate claims. *Exxon Mobil*, 545 U.S. at 552; *Peoples Nat'l Bank*, 362 F.3d at 336. Rule 12(b)(1) requires dismissal of claims where the Court "lack[s] jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1).

A federal court must consider a motion to dismiss pursuant to Rule 12(b)(1) before any other challenge because a court must have subject matter jurisdiction to determine the validity of a claim. *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994). The party asserting jurisdiction constantly bears the burden of proof to show that jurisdiction does in fact exist. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Where the motion to dismiss is based on the complaint alone, the court must decide whether the allegations in the complaint sufficiently state a basis for subject matter jurisdiction. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. May 1981).

But when the motion to dismiss raises a "factual" attack upon the complaint—contesting the facts pled in support of subject matter jurisdiction, rather than the sufficiency of the pleadings—"the court may consider any evidence submitted by the parties that is relevant to the issue of jurisdiction." *Gibson v. Smith*, No. 15-2391, 2016 WL 1531816, at *3 (S.D. Tex. Apr. 15, 2016). In conducting this inquiry, the court considers "the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming*, 281 F.3d at 161 (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). "When a defendant makes a factual attack, the plaintiff 'has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction.'" *Kling v. Hebert*, 60 F.4th 281, 284 (5th Cir. 2023) (quoting *Paterson*, 644 F.2d at 523).

**b. Rule 12(b)(6)**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "This requirement provides opposing parties 'fair notice of what the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). In ruling on a 12(b)(6) motion, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks omitted). A court may rely on the complaint, its attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to state a claim to relief that is plausible on its face." *In re Katrina*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 569). As the United States Supreme Court has explained:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and quotation marks omitted). This plausibility standard calls for enough facts "to raise a reasonable expectation that discovery will reveal evidence" to support the elements of the claim; however,

mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" do not suffice. *Id.* (citation omitted).

"A court should not dismiss a complaint with properly pled factual allegations, even if it strikes [the court] that actual proof of those alleged facts is improbable." *Bazinet v. Beth Israel Lahey Healthy, Inc.*, 113 F.4th 9, 15 (5th Cir. 2024) (quoting *Twombly*, 550 U.S. at 556) (cleaned up). However, "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Ultimately, motions to dismiss under Rule 12(b)(6) "are viewed with disfavor and are rarely granted." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005).

## III. ANALYSIS

### a. Exhaustion of Administrative Remedies

Defendants first assert that some of Plaintiffs' claims should be dismissed for failure to exhaust administrative remedies under the FTCA. *See* R. Doc. 88-1 at 14–16. Specifically, Defendants argue that Plaintiffs failed to exhaust their administrative remedies as applied to J.K.A.'s claims relating to being put in cells that were allegedly infected with COVID-19 and Plaintiffs' claims of alleged misconduct they faced after being transferred from Pine Prairie, Louisiana, including on a deportation flight to Cameroon. *See id.*

The FTCA "grants a limited waiver of sovereign immunity and allows tort claims against the United States." *Willoughby v. U.S. ex rel. U.S. Dep't of the Army*, 730 F.3d 476, 479 (5th Cir. 2013). Under the FTCA, no action may be brought against

the United States unless the claimant first presents the claim to the appropriate federal agency. 28 U.S.C. § 2675(a). The FTCA states that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401; *see also Johnson v. United States*, 460 F.3d 616, 621 (5th Cir. 2006) ("Section 2401(b) bars a tort action against the federal government unless the claim is first presented to the appropriate federal agency 'within two years after such claim accrues.'").

The Fifth Circuit has emphasized that the FTCA's administrative-exhaustion requirement is a jurisdictional prerequisite to filing suit. *See Coleman v. United States*, 912 F.3d 824, 834 (5th Cir. 2019) (affirming a district court's judgment that "exhaustion [of administrative remedies is] a jurisdictional prerequisite for FTCA claims that cannot be waived"); *Life Partners Inc. v. United States*, 650 F.3d 1026, 1030 (5th Cir. 2011) (The administrative-remedy-exhaustion "requirement is a prerequisite to suit under the FTCA."); *McAfee v. 5th Cir. Judges*, 884 F.2d 221, 222–23 (5th Cir. 1989) ("Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under the [FTCA], and absent compliance with the statute's requirement the district court was without jurisdiction.").

"Exhaustion gives an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court.'" *Woodford*

*v. Ngo*, 548 U.S. 81, 89 (2006) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)). "[T]he purpose of the FTCA's notice-of-claim requirement 'will be served as long as a claim brings to the Government's attention facts sufficient to enable it thoroughly to investigate its potential liability and to conduct settlement negotiations with the claimant.'" *Pleasant v. U.S. ex rel. Overton Brooks Veterans Admin. Hosp.*, 764 F.3d 445, 449 (5th Cir. 2014) (quoting *Rise v. United States,* 630 F.2d 1068, 1071 (5th Cir.1980)). Accordingly, "a notice of claim requirement is satisfied 'if the claimant (1) gives the agency written notice of his or her claim sufficient to enable the agency to investigate and (2) places a value on his or her claim.'" *Id*. (quoting *Adams v. United States,* 615 F.2d 284, 289, *decision clarified on denial of reh'g,* 622 F.2d 197 (5th Cir. 1980)).

*i. J.K.A.'s Covid-19 Claim*

Defendants first argue that J.K.A. did not exhaust his administrative remedies as it applies to his claims that he was placed in solitary confinement cells previously occupied by quarantined individuals exposed to or infected by COVID-19, and thereafter developed symptoms consistent with COVID-19. *See* R. Doc. 88-1 at 14–15. Specifically, Defendants claim that "J.K.A.'s administrative claim shows that he did not bring a claim related to being put in the allegedly infected cells." *See id*. at 15.

J.K.A.'s SF-95 form alleged the following, in relevant part:

> During his detention, he suffered medical negligence and gross negligence and misconduct by ICE officials, primarily during and after participating in a peaceful protest in August 2020 at Pine Prairie ICE Processing Center in Louisiana [ ]. During the 14 months in [detention], [J.K.A.] suffered severe medical negligence and negligent use of force.

> In March 2020 at Pine Prairie, asylum seekers held by ICE engaged in peaceful demonstrations protesting their indefinite and inhumane detention, the conditions of detention, and discriminatory treatment.
>
> The detained protestors were demanding a meeting with ICE officers and public attention to express their fears about being detained under COVID-19 and prolonged detention.
>
> [J.K.A.] and other detained asylum seekers were protesting against their … conditions of confinement … and the inhumanity of being imprisoned during the global COVID-19 pandemic.
>
> On August 24, 2020, all 45 African hunger strikers were rounded up by officials in full military gear and taken to "Echo" unit – the unit used by Pine Prairie for solitary confinement. … [T]hose placed in Echo unit face severe punitive conditions including, … no … means to make medical requests …. [J.K.A.] was placed in punitive solitary confinement for one week. He was isolated from other individuals and confined to a cell …. He was unable to access sanitation materials.
>
> ICE breached its duty by failing to ensure safe, humane, and sanitary conditions when [J.K.A.] was in their custody at Pine Prairie.
>
> ICE is responsible for failing to provide medical care to [J.K.A.] while he was in its custody at Pine Prairie.

*See* R. Doc. 88-2 at 7–11.

Plaintiffs maintain that these allegations in J.K.A.'s SF-95 are "sufficient to put an agency 'on notice that its actions … were part of the chain of events' that resulted in the event that serves as the basis for the claim." *See* R. Doc. 92 at 14 (quoting *Rise*, 630 F.2d at 1071). They further claim that although he did not specifically allege that he was exposed to, and in fact contracted, COVID-19 while in solitary confinement, J.K.A. alleged injuries resulting from medical negligence, failure to maintain sanitary conditions, and solitary confinement. *See id*. Based on this, Plaintiff's assert that the allegations in J.K.A.'s SF-95 "were more than

sufficient to give the federal government the opportunity to investigate his FTCA claims prior to litigation." *See id.*

Defendants argue that including allegations of protesting COVID-19 exposure was not sufficient to place the agency on notice that J.K.A. was asserting a claim regarding a specific, allegedly contaminated cell he was placed in such that it could be investigated. *See* R. Doc. 93 at 2. Defendants also argue that the lack of reference to the allegedly contaminated cell is highlighted by the fact that T.B.F. specifically included a claim about his cell in his SF-95. *See id.* Based on this, Defendants claim that J.K.A. failed to exhaust his administrative remedies as to any claims related to COVID-19 exposure. *See id.*

Plaintiffs are correct. The Fifth Circuit has stated that "[a]s long as 'the Government's investigation of [the] claim should have revealed theories of liability other than those specifically enumerated therein, those theories can properly be considered part of the claim.'" *Life Partners Inc. v. United States*, 650 F.3d 1026, 1030 (5th Cir. 2011) (quoting *Rise,* 630 F.2d at 1071). Here, J.K.A.'s SF-95 made allegations concerning medical negligence, solitary confinement, and the conditions of his confinement. *See* R. Doc. 88-2 at 7–11. We find those allegations were specific enough to bring "to the Government's attention facts sufficient to enable it thoroughly to investigate its potential liability and to conduct settlement negotiations with the claimant." *See Rise,* 630 F.2d at 1071. Accordingly, we have subject matter jurisdiction to hear J.K.A.'s claim as it relates to allegedly being placed in a contaminated cell, and Defendants' motion to dismiss this claim is denied.

*ii. Alleged Misconduct After Being Transferred from Pine Prairie*

As to any potential claims under the FTCA for misconduct after being transferred from Pine Prairie, Plaintiffs failed to exhaust their administrative remedies. As noted by Defendants, both Plaintiffs' SF-95s focus solely on alleged misconduct that occurred while at Pine Prairie. *See* R. Docs. 88-2, 88-3. Although Plaintiffs' argue that the SF-95s refer to their entire period of detention, simply including the fact that they were detained "from August 2019 through October 2020" in the first sentence, *see id.*, does not "bring[] to the Government's attention facts sufficient to enable it thoroughly to investigate its potential liability and to conduct settlement negotiations with the claimant." *See Pleasant*, 764 F.3d at 449 (quoting *Rise,* 630 F.2d at 1071). Accordingly, we lack subject matter jurisdiction to hear any claims under the FTCA for alleged misconduct after Plaintiffs were transferred from Pine Prairie.

**b. Intentional Tort Exception to the FTCA**

*i. Abuse of Process, Battery, and Assault*

The FTCA waives sovereign immunity and permits suit against the United States for monetary claims sounding in state tort law that allege negligent or wrongful acts committed by government employees. *Spotts v. United States*, 613 F.3d 559, 566 (5th Cir. 2010) (citing 28 U.S.C. § 2674). This waiver, however, is subject to various exceptions which preserve the United States' sovereign immunity. *Id.* One such exception to the FTCA's waiver of sovereign immunity is the "intentional tort exception," which "preserves the Government's immunity from suit for '[a]ny claim

arising out of *assault*, *battery*, false imprisonment, false arrest, malicious prosecution, *abuse of process*, libel, slander, misrepresentation, deceit, or interference with contract rights.'" *Millbrook v. United States*, 569 U.S. 50, 52 (2013) (emphasis added) (citing 28 U.S.C. § 2680(h)). But, there is an exception to this exception. The "law enforcement proviso" to the intentional tort exception "extends the waiver of sovereign immunity to claims for six intentional torts[2] ... that are based on the 'acts or omissions of investigative or law enforcement officers.'" *Id.* at 52–53 (citing 28 U.S.C. § 2680(h)). In short, if the "law enforcement proviso" applies, sovereign immunity is waived. *Id.*

Here, Plaintiffs' Amended Complaint asserts claims for the intentional torts of assault, battery, and abuse of process. *See generally* R. Doc. 29. Plaintiffs' allegations largely allege that "officers," "ICE officers," or "federal employees, officials, and agents" committed the alleged intentional torts against them. *See generally id*. Defendants argue that Plaintiffs have not sufficiently pled facts to show the officers and officials at Pine Prairie are federal law enforcement officers within the meaning of the proviso. *See* R. Doc. 93 at 3. Defendants further argue that Plaintiffs' Complaint does not contain sufficient allegations "to determine whether an identifiable federal officer was present at the facility at any relevant time or involved in any alleged action or incident set forth therein." *See id* at 4.

Plaintiffs' Amended Complaint, while not specifying the particular roles of the "officers" allegedly involved, refers generally to "officers," "ICE officers," or "federal

[2] These six intentional torts are: assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution. 28 U.S.C. § 2680(h).

employees, officials, and agents." *See generally* R. Doc. 29. Although Defendants argue that Plaintiffs do not sufficiently identify whether the officers involved in actions were "investigative and law enforcement officers," the Court finds otherwise and concludes that Plaintiffs' allegations are sufficient to satisfy the law enforcement sovereign immunity waiver under § 2680(h). *See Campos v. United States*, 888 F.3d 724, 737 (5th Cir. 2018) ("[Customs and Border Protection] officers [are] law enforcement officers" under § 2680(h)); *see also Agyeman v. Corrections Corp. of Am.*, 390 F.3d 1101, 1103–04 (9th Cir. 2004) (opining that plaintiff, who was allegedly assaulted and unlawfully restrained while held at an ICE detention facility operated by a private prisoner, "could have brought a suit against the United States under the [FTCA]," as opposed to a *Bivens* suit against the private corporation itself); *Chapa v. U.S. Dep't of Justice*, 339 F.3d 388, 390 (5th Cir. 2003) (treating BOP employees as law enforcement officers for purposes of the intentional torts proviso); *Caban v. United States*, 671 F.2d 1230, 1234–35 (2d Cir. 1982) (treating immigration officials as investigative or law enforcement officers for the purposes of the FTCA). Accordingly, Defendants' motion to dismiss is denied in this regard.

*ii. Other Claims "Arising Out Of" Intentional Torts*

Defendants also contend that Plaintiffs' claims of negligent supervision, negligence, and intentional infliction of emotional distress "must also be dismissed" because they arise out of the enumerated torts of abuse of process, battery, and assault. *See* R. Doc. 88-1 at 17. However, since the Court determined that Plaintiffs'

intentional tort claims are not subject to dismissal, *see ante* at 15–17, this argument fails.

**c. Independent Contractor Exception**

Under the FTCA, Congress has waived sovereign immunity and has granted consent for the government to be sued for acts committed by any "employee of the Government while acting within the scope of his office or employment."[3] 28 U.S.C. § 1346(b). "The FTCA, however, does not extend to acts of independent contractors." *Linkous v. United States*, 142 F.3d 271, 275 (5th Cir. 1998) (citation omitted). Therefore, if the act was not committed by an "employee of the Government," then the court must dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). *See Broussard v. United States*, 989 F.3d 171, 177 (5th Cir. 1993).

Here, Defendants are correct in asserting that "[c]ompanies that contract with the United States are generally deemed independent contractors and thus do not come within the definition of a federal agency for purposes of the FTCA." *See* R. Doc. 93 at 9 (citing *Malachowski v. United States*, No. 20-190, 2023 WL 3119680, at *12 (N.D. Tex. Feb. 9, 2023)). However, that is not the end-all-be-all. The Fifth Circuit has provided numerous factors that are relevant in determining whether an independent contractor relationship exists. *See Linkous*, 142 F.3d at 275–76 (listing factors). The most critical of which is the power of the federal government to control the detailed physical performance of the individual. *See id*. Defendants here even

[3] "Employee of the Government" is defined to include "officers or employees of any federal agency, members of the military or naval forces of the United States, ... and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671.

acknowledge this. *See* R. Doc. 88-1 at 20. But instead of analyzing those factors, or discussing their degree of control over Geo Group, Defendants simply rely on the fact that they contracted with Geo Group, and thus, Geo Group must be an independent contractor. Merely claiming that an independent contractor relationship exists is not enough; just as calling something a duck does not make it one, it must look like a duck, swim like a duck, and quack like a duck. And as Plaintiffs point out, *see* R. Doc. 92 at 22–23, Defendants have not come close to showing that it does. Thus, Plaintiffs have met their burden of showing that the independent contractor exception does not deprive this Court of subject matter jurisdiction over Plaintiffs' FTCA claims at this stage.

**d. APA and *Accardi* Claims**

The final issue is whether Plaintiffs have stated claims for violations of the APA. Specifically, Plaintiffs argue that DHS and ICE have violated the *Accardi* doctrine, which generally requires administrative agencies to follow their own rules. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *see also Fort Stewart Schs. v. Fed. Lab. Rels. Auth.*, 495 U.S. 641, 654 (1990) ("It is a familiar rule of administrative law that an agency must abide by its own regulations."). Plaintiffs submit that the agencies failed to comply with their own policies regarding "confidentiality …, failed to protect Plaintiffs and subjected them to imminent risk of retaliatory violence by the Cameroonian government and non-state actors upon deportation." *See* R. Doc. 29 at 38. Further, Plaintiffs' submit that the agencies "failed

to comply with and ensure compliance with their own policies regarding removals, hunger strikes, use of force, segregation, and health care …." *See id.* at 39.

Defendants move to dismiss Plaintiffs' APA and *Accardi* claims on the basis that Plaintiffs' claims are precluded because they are "merely recast variations of Plaintiffs' tort claims" where the FTCA provides and adequate remedy. [4] *See* R. Doc. 88-1 at 20–22.

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. However, only "[a]gency action made reviewable by statute and final agency action for which there is *no other adequate remedy* in a court are subject to judicial review." 5 U.S.C. § 704 (emphasis added).

The "adequate remedy" provision of § 704 is intended "simply to avoid duplicating previously established special statutory procedures for review of agency actions." *Darby v. Cisneros*, 509 U.S. 137, 146 (1993) (citing *Bowen v. Massachusetts*,

[4] In their reply, Defendants move to dismiss Plaintiffs' APA and *Accardi* claims on two other bases. First, Defendants argue that Plaintiffs' APA claims are not applicable because the Amended Complaint does not refer to any "final agency action" that is reviewable under the APA. *See* R. Doc. 93 at 7. Second, Defendants argue that Plaintiffs' claims under the *Accardi* doctrine fall short because Plaintiffs' "failed to assert any prejudice that would warrant a claim." *See id.* However, because Defendants did not raise these arguments in their Motion to Dismiss, we will decline to rely on them. *See Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 99 F.4th 770, 774 (5th Cir. 2024) ("[W]hen a party raises new arguments or evidence for the first time in a reply, the district court must either give the other party an opportunity to respond or decline to rely on the new arguments and evidence." (citing *Residents of Gordon Plaza, Inc. v. Cantrell*, 25 F.4th 288, 296 (5th Cir. 2022) ("[A] district court abuses its discretion when it considers new arguments raised for the first time in a reply brief without providing the non-movant an adequate opportunity to respond prior to a ruling.") (internal quotation omitted); and *RedHawk Holdings Corp. v. Schreiber*, 836 F. App'x 232, 235 (5th Cir. 2020) ("[A] district court may consider arguments and evidence raised for the first time in a reply brief without abusing its discretion so long as it gives the non-movant an adequate opportunity to respond prior to a ruling.") (internal quotations omitted)).

487 U.S. 879, 903 (1988)). At a minimum, the alternative remedy must provide the petitioner "specific procedures" by which the agency action can receive judicial review or some equivalent. *Bowen*, 487 U.S. at 903. The adequacy of the relief available need not provide an identical review that the APA would provide, so long as the alternative remedy offers the "same genre" of relief. *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 846 F.3d 1235, 1245 (D.C. Cir. 2017) (quoting *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1272 (D.C. Cir. 2005)); *see also Rimmer v. Holder*, 700 F.3d 246, 262 (6th Cir. 2012); *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) ("The relevant question under the APA ... is not whether [the alternatives to APA relief] are as effective as an APA lawsuit against the regulating agency, but whether the private suit remedy provided by Congress is adequate."). The adequate alternative remedy analysis thus requires "a case-specific evaluation." *Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018).

The Supreme Court has "long instructed that the 'generous review provisions' of the APA must be given 'a hospitable interpretation' such that 'only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review.'" *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)); *see also Texas v. United States*, 126 F.4th 392, 417 (5th Cir. 2025).

We conclude that the FTCA is not an "adequate remedy" within the meaning of 5 U.S.C. § 704 so as to preclude an action under the APA. Like that of the Tucker Act analyzed by the Supreme Court in *Bowen*, the FTCA provides review procedures that are needed to remedy "particular categories of past injuries"—namely, torts committed by federal employees. *See Bowen*, 487 U.S. at 904 n.39. The APA, on the other hand, "manag[es] the relationships" between federal agencies and the individuals impacted by the decisions made by those agencies. *Id*. Further, while the FTCA allows for suits for money damages, 28 U.S.C. § 1346(b)(1), it does not waive sovereign immunity for equitable relief. *Robinson v. Sherrod*, 631 F.3d 839, 841 (7th Cir. 2011) (citing *Hatahley v. United States*, 351 U.S. 173, 182 (1956) ("[T]he District Court did not possess the power to enjoin the United States.")); *Pesnell v. United States*, 64 F. App'x 73, 74 (9th Cir. 2003) ("The FTCA does not contain a waiver of sovereign immunity for equitable claims."). Thus, for those seeking equitable relief, the FTCA is clearly not an adequate remedy. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 477 (1994) (noting that claims under the FTCA are only cognizable if they are "for money damages"); *see also Bowen*, 487 U.S. at 905 ("[A] naked money judgment against the United States will [not] always be an adequate substitute for prospective relief."); *Robinson*, 631 F.3d at 841 ("[D]amages might be an inadequate remedy for debilitating, constant, and perhaps increasing pain.... [F]ederal inmates can invoke the APA to obtain an order for medical treatment."). Accordingly, Defendants' motion to dismiss Plaintiffs' APA and *Accardi* claims is denied.

## IV. CONCLUSION

For the reasons set forth herein, Defendants' Motion to Dismiss (R. Doc. 88) is hereby **GRANTED IN PART AND DENIED IN PART**.

**IT IS ORDERED** that Defendants' Motion is **GRANTED** insofar as all FTCA claims by Plaintiffs arising after their transfer from Pine Prairie, and those claims are hereby **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that the Motion is **DENIED** in all other respects.

**THUS DONE AND SIGNED** this 28th day of September, 2026.

Jerry Edwards, Jr.

**JERRY EDWARDS, JR.**
**UNITED STATES DISTRICT JUDGE**